**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| SAVANNAH MOTORCARS, LLC; and PEACOCK RE, LLC, | | |
| Plaintiffs, | | CIVIL ACTION NO.: 4:20-cv-37 |
| v. | | |
| VOLKSWAGEN GROUP OF AMERICA, INC., | | |
| Defendant. | | |

**<u>O R D E R</u>**

      This action arises from Defendant Volkswagen Group of America, Inc.'s failure to consent to Plaintiff Savannah Motorcars, LLC and Plaintiff Peacock RE, LLC's proposed sale of a Volkswagen dealership to non-party Step One Automotive Group, LLC.  (Doc. 1 (Complaint); (doc. 70 (Amended Complaint).)  Plaintiffs filed suit against Defendant, asserting a claim under Georgia's Motor Vehicle Franchise Practices Act, O.C.G.A. § 10-1-620, *et seq*., and a claim for breach of contract.  (Doc. 70, pp. 6–7.)  Presently before the Court are Defendant's Motion for Summary Judgment, (doc. 43), and Plaintiffs' Motion for Partial Summary Judgment, (doc. 50). Defendant filed a Response to Plaintiffs' Motion, (doc. 59), and Plaintiffs filed a Reply, (doc. 62). For the following reasons, the Court **DENIES** Defendant's Motion for Summary Judgment, (doc. 43), and **DENIES** Plaintiffs' Motion for Partial Summary Judgment, (doc. 50).  The Court **DIRECTS** the Clerk of Court to file this Order **IN A RESTRICTED MANNER** on the record of the case whereby only the parties and the Court have access to it.  Further, the Court **DIRECTS**

the Clerk of Court to attach a redacted version of this Order that is accessible on the public record of the case.[1]

## BACKGROUND

### I.     Factual Background

#### A.     The Parties

Defendant Volkswagen Group of America, Inc. ("Volkswagen") is a distributor of new Volkswagen vehicles that utilizes a network of authorized car dealerships to distribute its vehicles in Georgia.  (Doc. 43-2, p. 5; doc. 50-2, p. 3.)  Plaintiff Savannah Motorcars, LLC ("Savannah Motorcars") is an independently owned and operated motor vehicle dealer that operated an authorized Volkswagen dealership located at 50 Eisenhower Drive, Savannah, Georgia (the "Dealership").  (Doc. 43-2, p. 5; doc. 50-2, p. 3.)  Though disputed by Volkswagen, Plaintiff Peacock RE, LLC ("Peacock RE") is, according to Plaintiffs, the owner of the real property on which the Dealership sits (the "Dealership Land").  (Doc. 50-2, p. 33; doc. 60, pp. 22–25; see also doc. 43-3, pp. 164–65.)

#### B.     The Dealer Agreement

To operate the Dealership for the sale and service of Volkswagen vehicles, Savannah Motorcars entered into a Volkswagen Dealer Agreement (the "Dealer Agreement") with

---

[1]  Several exhibits have been sealed by prior Order of the Court based on the parties' representations that they contain sensitive sales and financial information, the disclosure of which could be harmful to non-party Step One Automotive Group, LLC.  (Docs. 46, 53.)  The Court has again considered the contents of the sealed exhibits and assessed whether Step One's interest in the confidentiality of the information contained within these documents outweighs the public's right to access that information.  While not all information contained within each of the sealed exhibits warrants protection from public view, much of the information contained therein does warrant such protection.  The Court must recount some of that information in this Order to rule on the parties' Motions.  To balance Step One's need for confidentiality and the public's right to access, the Court has prepared a version of this Order which redacts any information the Court deems warrants protection from public view.  The version of this Order with those redactions will be filed on the public docket, and an unredacted version of this Order will be filed in a restricted manner, with access thereto restricted to only the Court and the parties.

Volkswagen, which governs the "franchisor-dealer" relationship between the two entities.[2] (See doc. 43-2, p. 5; doc. 50-2, p. 3.)   The Dealer Agreement incorporates the Dealer Agreement Standard Provisions (the "Standard Provisions") as part of the agreement. (Doc. 43-2, p. 5; doc. 50-2, pp. 3–4.) Article 12 of the Standard Provisions (entitled "Succeeding Dealers") contemplates the procedures and respective rights of Volkswagen and Savannah Motorcars in the event Savannah Motorcars seeks to sell the Dealership to another party. (See doc. 43-3, pp. 108–10.) Among these rights is Volkswagen's contractual right of approval over any proposed transfer of the Dealership. (Id. at p. 108.) Specifically, Volkswagen "has the right to approve [a] proposed transferee[]" but must "consider in good faith any such proposal [Savannah Motorcars] may submit to it during the term of th[e] [Dealership] Agreement." (Id.; see also doc. 43-2, p. 7; doc. 50-2, p. 4.)   In determining whether to approve a proposed transfer, Volkswagen must consider "the personal, business, and financial qualifications of the proposed new owners and executives as well as the proposal's effect on competition. In such evaluation, [Volkswagen] may consult with the proposed new owners and executives on any aspect of the transaction." (Doc. 43-3, p. 108; see also doc. 43-2, p. 7; doc. 50-2, p. 4.) Volkswagen must notify Savannah Motorcars in writing of its approval or disapproval of a proposed transfer within 45 business days after Savannah Motorcars has "furnished to [Volkswagen] all applications and information reasonably requested by [Volkswagen] to evaluat[e]" the proposal. (Doc. 43-3, p. 108; see also doc. 43-2, p. 7; doc. 50-2, p. 5.)

Article 12 also grants to Volkswagen a right of first refusal over any proposed sale of the Dealership. (Doc. 43-3, pp. 108–09.)   Specifically, "[w]henever [Savannah Motorcars] proposes to transfer its principal assets or change owners of a majority interest, [Volkswagen] shall have the

---

[2] Notably, Peacock RE is not a party to the Dealer Agreement.  (Doc. 43-2, p. 6; doc. 50-2, p. 4.)

right to purchase such assets or ownership interest."  (Id. at p. 108; see also doc. 43-2, p. 7; doc. 50-2, p. 5.)  To exercise the right of first refusal, Volkswagen must notify Savannah Motorcars in writing within thirty calendars days after Savannah Motorcars has furnished "all applications and information reasonably requested" by Volkswagen.  (Doc. 43-3, p. 108.)

> ### C.      Volkswagen's Candidate Selection Criteria

To guide its decisions on whether to approve prospective Volkswagen dealers, Volkswagen maintains internal Dealer Candidate Selection Policies and Procedures (the "Dealer Candidate Policies").  (See doc. 43-3, pp. 122–23; see also doc. 43-2, p. 8; doc. 50-2, pp. 5–6.)  Pursuant to the Dealer Candidate Policies, "[a]ll proposed owners of greater than 10% of the beneficial ownership of a Dealership require approval from Volkswagen."  (Doc. 43-3, p. 122.)  To determine whether to approve a new owner, Volkswagen examines seven criteria: (1) operational acumen; (2) financial capacity; (3) location; (4) facility; (5) character; (6) management capacity; and (7) prior terminations.  (Id. at pp. 122–23; see also doc. 43-2, p. 8; doc. 50-2, p. 6.)  Concerning the "operational acumen" criterion (the "Operational Acumen Standard"), Volkswagen examines "2 years plus the latest available year-to-date data regarding [a] candidate's performance operating a retail automotive outlet."  (Doc. 43-3, p. 122; see also doc. 43-2, p. 8; doc. 50-2, p. 6.)  Volkswagen examines whether a proposed candidate has demonstrated (1) the "ability to exceed expected level of sales in a market area, as measured by sales index, sales effectiveness, market share, or similar metric"; (2) the "ability to exceed customer needs, as measured by customer satisfaction index (CSI) scores or similar metric"; (3) the ability "to profitably operate a retail automotive outlet as evidenced by past and most current financial statements"; and (4) the ability "to obtain a license to operate a retail automotive outlet."  (Doc. 43-3, p. 122; see also doc. 43-2, p. 8; doc. 50-2, p. 6.)  Concerning the "financial capacity" criterion (the "Financial Capacity Standard"), Volkswagen

examines a candidate's "ability to meet or exceed capitalization requirements for the planning volume of the proposed Dealership."  (Doc. 43-3, p. 122; see also doc. 43-2, p. 9; doc. 50-2, p. 6.) The Financial Capacity Standard also mandates that "the operating investment for any application package consists of a maximum one-to-one ratio of borrowed-to-owned capital."  (Doc. 43-3, p. 122.)

In addition to the Dealer Candidate Policies, Volkswagen has a Dealership Capitalization Policy (the "Capitalization Policy").  (Id. at pp. 124–28; see also doc. 43-2, p. 9; doc. 50-2, p. 6.) According to the Capitalization Policy, "[i]n order to support a successful business model and sustain a robust dealer network, it is imperative that dealership operations remain properly capitalized.  All Network actions are to be reviewed to ensure proper capitalization."  (Doc. 43-3, p. 124.)  The Capitalization Policy provides that the "[i]nvestment of unencumbered personal capital should be adequately verified" and that the "Dealership must maintain a debt-to-equity ratio of 1:1; or, at least 50% of working capital must be in the form of encumbered funds."  (Id. at pp. 124–25; see also doc. 43-2, p. 9; doc. 50-2, p. 6.)  Finally, the Capitalization Policy restricts the types of fund sources prospective purchasers may use.  (See doc. 43-3, pp. 124–25.)  Pertinent to this case, the Capitalization Policy permits "[c]apital loans" as a funds source but prohibits "[b]alloon payment loans and lines of credits such as 'revolving credit lines'" because "these lines can be terminated at any time by the finance source."  (Id. at pp. 124, 128)

**D.    Volkswagen's Procedures for Processing Proposed Sales**

Brian Kelly, Volkswagen's vice president of network operations, testified about the "general" process Volkswagen follows when it receives notice of a proposed transfer of a

5

dealership.[3]  (Doc. 43-18, p. 4; see doc. 43-2, pp. 9–10; doc. 50-2, p. 7; see also doc. 50-5, p. 10.)

According to Kelly, once Volkswagen receives notice of a proposed transfer, the proposed asset

purchase agreement is distributed to all relevant parties.  (Doc. 43-18, p. 4.)  Next, Volkswagen

conducts a "buy-sell launch call," during which Volkswagen's regional, corporate, and legal

offices discuss their respective reviews of the proposed purchase agreement.  (Id.)  After the call,

Volkswagen sends the buyer and seller a "buy-sell launch letter" that requests information so that

Volkswagen can review the proposed transfer.  (Id.)  Volkswagen's regional office then prepares

a binder of all the required information and disseminates the contents of the binder to the corporate

and legal offices for review.  (Id.)  Once the relevant parties at Volkswagen discuss the "merits"

of the proposed purchase agreement, Volkswagen issues a "conditional letter of approval . . . if all

issues have been resolved and [there] is a clear pathway moving forward."  (Id.)  If there is not a

"clear pathway moving forward," Volkswagen will communicate its concerns to the dealer and

attempt to "mitigate those concerns."  (Id.)  If the concerns are mitigated, then Volkswagen issues

a conditional letter of approval, and the parties close the deal.  (Id. at pp. 4–5.)

### E.   Savannah Motorcars and Step One's Asset Purchase Agreement

On August 21, 2018, Savannah Motorcars and Peacock RE entered into a Dealership Asset

Purchase Agreement (the "Savannah APA") with Step One Automotive Group, LLC ("Step One")

(the "Proposed Transfer").  (Doc. 43-2, p. 10; doc. 50-2, p. 7; see also doc. 43-3, pp. 129–62.)

Under the Savannah APA, Step One was "to acquire certain assets used in the operation of, and to

assume certain liabilities of, the automotive dealerships described on Exhibit A."  (Doc. 43-2, p.

10; doc. 50-2, p. 8.)   Exhibit A describes the dealerships transferred as the "[Dealership] and

---

[3]   As vice president of network operations, Kelly is responsible for the strategy and development of
Volkswagen's dealer network (i.e., "the number, the placement, [and] the qualifications for dealers in the
[United States]").  (Doc. 50-5, p. 10.)

affiliated Alfa Fiat dealership." (Doc. 43-3, p. 163; <u>see</u> doc. 43-2, p. 10; doc. 50-2, p. 8.) Exhibit A also lists and describes the Dealership Land, which is legally described in Exhibit A-1. (Doc. 43-3, pp. 164–65; <u>see</u> doc. 43-2, p. 11; doc. 50-2, p. 8.) The aggregate purchase price for the "goodwill" and "other intangible assets" of the Dealership was $1,260,000. (Doc. 43-3, p. 166; <u>see</u> doc. 43-2, p. 11; doc. 50-2, p. 8.) The purchase price for the Dealership Land was $9,450,000. (Doc. 43-3, p. 169; <u>see</u> doc. 43-2, p. 11; doc. 50-2, p. 8.) Furthermore, on the same day Plaintiffs entered into the Savannah APA with Step One, Plaintiffs' affiliates entered into a separate Dealership Asset Purchase Agreement with Step One for the sale (to Step One) of a Chrysler, Dodge, Jeep, and Ram dealership and a Hyundai dealership in Brunswick, Georgia (the "Brunswick APA"). (Doc. 43-2, p. 11; doc. 50-2, p. 8; <u>see</u> doc. 43-3, pp. 178–211.)

Under the Savannah APA, either Savannah Motorcars or Step One could terminate the agreement if the deal did not close by October 31, 2018, (the "Closing Date") but Savannah Motorcars had the option to extend the closing date deadline for up to an additional thirty days by providing written notice to Step One prior to the Closing Date. (Doc. 43-3, pp. 152–53.) Furthermore, the parties were not required to perform their obligations under the Savannah APA unless the following conditions, among others, were fulfilled or waived by the parties: (1) Volkswagen "shall have issued (or agreed to issue) to [Step One] a new Franchise Agreement permitting [Step One] to operate the Dealership . . . on terms and conditions that are typically required by" Volkswagen; (2) Step One "shall have received approval from the respective manufacturers, with respect to the acquisition of the assets and real property . . . as set forth in the" Brunswick APA; (3) "FCA US, LLC shall have agreed to award [Step One] an Alfa and Fiat dealership for the Savannah, Georgia area, which [Step One] shall diligently pursue"; and (4) Savannah Motorcars "shall have dismissed with prejudice the Peacock Automotive, LLC v. FCA

7

US LLC Case No. 4:18 CV 00060 presently pending in the United State[s] District Court, Southern District of Georgia, Savannah Division (the 'FCA Lawsuit'), and any counterclaims made against Peacock or its affiliates . . . shall have been dismissed with prejudice."  (Id. at pp. 144–46.) Moreover, the Savannah APA required Plaintiffs and Step One to "cooperate in good faith and . . . use . . . respective reasonable efforts to obtain the approval by [Volkswagen] of and appointment of [Step One] as an authorized dealer."  (Id. at pp 158–59.)  Finally, Section 5.1 of the Savannah APA required Step One to deliver $250,000 to an escrow agent (the "Escrow Deposit") within three days of the Savannah APA's "effective date" (August 21, 2018) and permitted Savannah Motorcars to terminate the Savannah APA if Step One failed to do so.  (Doc. 43-2, p. 12; doc. 50-2, p. 9; see doc. 43-3, pp. 129–30.)

### F.    Events Subsequent to the Savannah APA

### (1)    The Dealer Launch Letter

On August 27, 2018, Savannah Motorcars notified Volkswagen of the Proposed Transfer and told Volkswagen that "[i]nformation regarding the financial wherewithal and relevant experience of [Step One] . . . shall be provided to [Volkswagen] under separate cover *prior to* submission of a dealer application."  (Doc. 43-3, p. 236; see also doc. 43-2, p. 13; doc. 50-2, p. 10.)  On September 10, 2018, Gordon Munroe, Volkswagen's senior manager of regional network operations, sent a letter (the "Dealer Launch Letter") via email to Warner Peacock and Fernando Arellano informing them that Volkswagen had received notice of the Proposed Transfer.[4]  (Doc. 43-3, p. 238; see also doc. 43-2, pp. 13–14; doc. 50-2, p. 10.)  The Dealer Launch Letter requested more information about Step One and the Proposed Transfer, including information pertinent to

---

[4]  As senior manager of regional network operations, Munroe was the "main point of contact" for dealers in the Southeast Region of the United States, including the Savannah area.  (Doc. 43-2, p. 14; doc. 50-2, p. 10.)  Warner Peacock is the CEO of both Savannah Motorcars and Peacock RE, and Fernando Arellano is the CEO and manager of Step One.  (Doc. 43-1, p. 7 n.4.)

Volkswagen's evaluation of its right of first refusal.  (Doc. 43-3, p. 238; <u>see also</u> doc. 43-2, p. 14; doc. 50-2, p. 10.)  Specifically, among other things, Volkswagen requested that Plaintiffs and Step One: (1) provide "information identifying the specific portion of the $1,260,000 good will portion of the purchase price and the other terms and considerations under the [Savannah APA] that are directly allocable to [Step One's] proposed acquisition of [the Dealership]"; (2) "advise how much of the purchase price for the [Savannah APA] is being paid either directly or indirectly for [Plaintiffs'] agreement to dismiss its lawsuit against FCA"; and (3) provide "any supporting documents or back up information that would be helpful to [Volkswagen's] understanding of the portion of the purchase price . . . that [is] directly allocable to [Step One's] proposed acquisition of [the Dealership][,] including . . . the dealer agreements for the other two dealerships and [the] complaint against FCA."  (Doc. 43-3, p. 238; <u>see also</u> doc. 43-2, p. 14; doc. 50-2, p. 10.)  Furthermore, the Dealer Launch Letter provided a list of the documentation Plaintiffs needed to provide to Volkswagen and stated that Volkswagen would not decide on the Proposed Transfer until it received "all of the requested information" and performed a "comprehensive management review."  (Doc. 43-3, pp. 238–41; doc. 43-2, p. 14; doc. 50-2, p. 10.)

### (2)   Volkswagen's Initial Refusal to Approve the Proposed Transfer

On October 9, 2018, Warner Peacock informed Volkswagen that $260,000 of the $1,260,00 "goodwill" purchase price was for the settlement of the FCA Lawsuit.  (Doc. 43-2, p. 15; doc. 50-2, p. 12.)  Then, on October 12, 2018, Step One, in response to the Dealer Launch Letter, communicated to Volkswagen that Step One was only purchasing a Volkswagen dealership (and, thus, not a Fiat Alfa dealership as referenced in the Savannah APA) and that no portion of the purchase price was for the dismissal of the FCA lawsuit.  (Doc. 43-2, p. 16; doc. 50-2, p. 12.)  Five days later, on October 17, 2018, Volkswagen received application documents from Step One

related to the Proposed Transfer via multiple emails.  (See doc. 43-6; doc. 43-2, pp. 16–17; doc. 50-2, p. 12.)  However, Bills Sauls, Step One's Chief of Staff and Rule 30(b)(6) designee, testified that these documents did not encompass the entire dealership application and that as of October 17, 2018, Volkswagen had not received Step One's dealer application or "nearly any of the documents" Volkswagen requested.  (Doc. 43-4, p. 33; see also doc. 43-2, p. 14; doc. 50-2, p. 10.)  Indeed, Volkswagen sent a letter on October 17, 2018, (the "First Rejection Letter") to Warner Peacock and Fernando Arellano stating that Volkswagen "ha[d] not received the information it needs to properly evaluate whether to exercise" its right of refusal or right to deny the transfer, that Volkswagen had not received "the dealer application or almost any of the supporting documentation that it requested," that Volkswagen could not process or evaluate the Proposed Transfer "without the critical documents" it requested, and that Volkswagen was confused regarding the possible purchase of the Fiat Alfa dealership.  (Doc. 43-3, pp. 272–76; see also doc. 43-2, p. 17; doc. 50-2, p. 13.)  The First Rejection Letter further stated that Volkswagen "formally decline[s] to provide its consent and approval to the Proposed Transfer" and that Volkswagen "invites [Plaintiffs and Step One] to resubmit the Proposed Transfer . . . [with] all requested documentation."  (Doc. 43-3, p. 275; see also doc. 43-2, p. 18; doc. 50-2, p. 13.)

### (3)    Volkswagen's Second Refusal to Approve the Proposed Transfer

After Volkswagen sent the First Rejection Letter, Savannah Motorcars indicated that it would not resubmit the Proposed Transfer.  (Doc. 43-2, p. 18; doc. 50-2, p. 13.)  Furthermore, despite Volkswagen's declination of the Proposed Transfer, Step One continued to submit documents to Volkswagen related to the Proposed Transfer.  (Doc. 43-2, p. 18; doc. 50-2, p. 13.)  On October 19, 2019, Step One sent to Volkswagen sales performance data regarding several other vehicle dealerships Step One owned and operated, including a Volkswagen dealership.  (See doc.

43, pp. 3–4; doc. 43-23, pp. 2–10 (sealed exhibit); see also doc. 43-2, p. 18; doc. 50-2, p. 13.)

According to Step One, five of the seven dealerships listed in Step One's sales performance data

were "subpar performers," and the Volkswagen dealership was the worst performer of the seven.

(Doc. 43-4, p. 37; see doc. 43-2, p. 18; doc. 50-2, p. 13.)  Then, on October 23, 2018, Step One

provided Volkswagen with information regarding its source of funds for the Proposed Transfer.

(Doc. 43-8; doc. 43-24, pp. 2–11 (sealed exhibit); see also doc. 43-2, p. 19; doc. 50-2, pp. 13–14.)

Volkswagen sent an email to Step One the next day raising concerns that the "document[s]

submitted indicate multiple Lines of Credit" and asking Step One to "provide details and

repayment obligations for each."  (Doc. 43-4, p. 49; see also doc. 43-2, p. 19; doc. 50-2, p. 16.)

After Step One did not respond, Volkswagen followed up with Step One on October 25, 2018.

(Doc. 43-4, p. 49; see also doc. 43-2, p. 19; doc. 50-2, p. 16.)

On October 26, 2018, five days before the Closing Date, Step One informed Savannah

Motorcars that it would not be able to obtain approval from "all of the manufacturers until

sometime in December" and requested a 45-day extension to obtain approval.[5]  (Doc. 43-4, pp.

59–60, see also id. at p. 38.)  In exchange for the extension, Step One offered to forfeit the Escrow

Deposit.  (Id. at p. 60.)  Sauls testified that Step One sought an extension because it was a "tight

window to get approval by the [Closing Date] from Volkswagen[,]" and Step One "had not

submitted documents . . . in . . . a timely fashion."  (Id. at p. 31; see also doc. 43-2, p. 20; doc. 50-

2, p. 17.)  Savannah Motorcars rejected Step One's extension request.[6]  (Doc. 43-2, p. 20; doc. 50-

2, p. 17.)

---

[5]  While the letter from Step One to Savannah Motorcars said "manufacturers," Sauls testified that Step
One was only waiting on Volkswagen's approval.  (Doc. 43-4, p. 38.)

[6]  According to Greg Humphries, a lawyer and partial owner of Plaintiffs, Savannah Motorcars was open
to granting Step One a closing date extension if Step One agreed to remove certain contingencies in the

On October 26, 2018, Volkswagen sent Plaintiffs another letter once again refusing to consent to the Proposed Transfer (the "Second Rejection Letter").  (See doc. 43-3, pp. 277–79; doc. 43-22, pp. 2–4 (sealed exhibit); see also doc. 43-2, pp. 20–21; doc. 50-2, pp. 18–19.)  The Second Rejection Letter indicated that Volkswagen did not receive all the information it requested and did not have an adequate amount of time to review the information it did receive.  (Doc. 43-2, pp. 20–21; doc. 50-2, pp. 18–19.)  The Second Rejection Letter also stated that, based on the information Volkswagen did receive and review, Step One was unqualified due to its past business experience, failed to demonstrate an ability to exceed expected levels of sales, and failed to meet Volkswagen's financial qualifications due to the sources of funds.  (Doc. 43-2, p. 21; doc. 50-2, p. 18.)  Finally, the Second Rejection Letter further communicated that Volkswagen did not receive sufficient information concerning the apportionment of funds to allow it to consider exercising its right of first refusal.  (Doc. 43-2, p. 21; doc. 50-2, p. 19.)  Thus, Volkswagen reiterated and reconfirmed its decision to withhold consent for the Proposed Transfer.  (Doc. 43-2, p. 21; doc. 50-2, p. 18.)

## II.  Procedural History

On February 20, 2020, Plaintiffs filed this action, alleging a state law claim under O.C.G.A. § 10-1-653[7] (Count I) and a breach of contract claim (Count II).  (Doc. 1, pp. 5–7; doc. 70, pp. 6–7.)  Under Count I, Plaintiffs allege that Volkswagen's refusal to approve the Proposed Transfer

---

Savannah APA, including the contingencies that allowed Step One to receive a refund of the escrow deposit if the Savannah APA was terminated.  (Doc. 50-6, pp. 24–25, 60–64.)  However, Step One and Plaintiffs were not able to reach an agreement for an extension.  (Id. at pp. 24–25.)

[7]  O.C.G.A. § 10-1-653 generally provides that if a vehicle franchisor, such as Volkswagen, refuses to consent to a proposed sale of a dealership, the franchisor must prove that its decision was not arbitrary and that the proposed new owner was "unfit or unqualified to be a dealer based on the franchisor's prior written, reasonable, objective, and uniformly applied" standards.  See O.C.G.A. § 10-1-653.

was arbitrary and that Volkswagen has no "prior written, reasonable, objective, and uniformly applied, within reasonable classifications, standards or qualifications which directly relate to the prospective transferee's business experience, moral character, and financial qualifications" that Step One did not meet.  (Doc., 70, p. 6.)  Under Count II, Plaintiffs allege that Volkswagen breached Article 12 of the Dealer Agreement's Standard Provisions because Volkswagen "failed to consider in good faith the Proposed Transfer and . . . has no reasonable standards relating to personal, business, and financial qualifications which Step One does not meet."  (Id. at p. 7.)  Volkswagen subsequently filed an Answer.  (Doc. 13.)  On June 11, 2021, Volkswagen filed its Motion for Summary Judgment.  (Doc. 43.)  Plaintiffs subsequently filed a Response and a Motion for Partial Summary Judgment.  (Doc. 50.)  Volkswagen filed a Response, (doc. 59), and Plaintiffs filed a Reply, (doc. 62).[8]

---

[8]  On February 24, 2022, Plaintiffs filed an Amended Complaint.  (Doc. 70.)  Under black letter federal law, "an amended complaint supersedes the initial complaint and becomes the operative pleading in the case." Lowery v. Ala. Power Co., 483 F.3d 1184, 1219 (11th Cir. 2007) (citations omitted).  As such, the Amended Complaint is the sole operating pleading in this case. (Doc. 70.)  While the filing of an amended complaint generally moots "the parties' previous pleadings stemming from the [original complaint]," Santiago v. Jaguar Therapeutics, LLC, No. 17-22749-CIV-MARTINEZ-OTAZO-REYES, 2019 WL 4731980, at *1 (S.D. Fla. Jan. 17, 2019) (citing Malowney v. Fed. Collection Deposit Grp., 193 F.3d 1342, 1345 n.1 (11th Cir. 1999)), the Court finds that it is still able to rule on the parties' motions for summary judgment in this case, (docs. 43, 50).  The only changes in the Amended Complaint involve Plaintiffs' allegations regarding the members of Peacock RE and Plaintiffs' subsequent sale of the Dealership and Dealership Land.  (Compare doc. 1 with doc. 70; see doc. 67-2.)  None of these changes appear significant to the parties' Motions.  (See docs. 43, 50.)  Importantly, Plaintiffs did not add any claims or change any other factual allegations in the Amended Complaint.  (Compare doc. 1 with doc. 70; see doc. 67-2.) Furthermore, none of the parties have requested leave to supplement their motions for summary judgment. Therefore, the Court construes Volkswagen's Motion for Summary Judgment, (doc. 43), and Plaintiffs' Motion for Partial Summary Judgment, (doc. 50), as motions for summary judgment on the claims raised in the Amended Complaint, (doc. 70).  See Coleman v. Boston Scientific Corp., No. 1:17-cv-439-TFM-C, 2020 WL 4815051, at *1 (S.D. Ala. June 4, 2020) (construing a motion for summary judgment filed prior to an amended complaint as a motion for summary judgment "on the claims raised in the amended complaint" where parties agreed that the amended complaint contained "relatively minor amendments to the complaint"); cf. Bujduveanu v. Dismas Charities, Inc., No. 11-20120-CIV-SIMONTON, 2012 WL 13129841, at *5 (S.D. Fla. Sept. 28, 2012) ("[V]arious allegations and claims made in the Plaintiff's Second Amended Complaint that were not made in the Plaintiff's First Amended Complaint have not been adequately addressed in the Plaintiff's Motion for Summary Judgment.  Thus, denying the Plaintiff's Motion for Summary Judgment without prejudice as being moot is appropriate."); but see Santiago, 2019

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346,

---

WL 4731980, at *1 ("Upon consideration of the procedural record, the Court finds that Plaintiff's filing of the Second Amended Complaint superseded the Amended Complaint and rendered moot . . . the instant Motion for Summary Judgment.").

1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir.

2007)).  Accordingly, in considering Plaintiff's motion for summary judgment, the Court will view

the facts in the light most favorable to Defendant, and in considering Defendant's motion, the

Court will view the facts in the light most favorable to Plaintiff.  See Am. Bankers Ins. Grp. v.

United States, 408 F.3d 1328, 1331 (11th Cir. 2005).  However, "facts must be viewed in the light

most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott

v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis

omitted).  Nonetheless, "[c]ross-motions for summary judgment will not, in themselves, warrant

the court in granting summary judgment unless one of the parties is entitled to judgment as a matter

of law on facts that are not genuinely disputed."  United States v. Oakley, 744 F.2d 1553, 1555

(11th Cir. 1984) (citation omitted).

## DISCUSSION

### I.    Georgia's "Transfer Statute"

The Georgia Motor Vehicle Franchise Practices Act (the "Act") regulates the continuation

and succession of motor vehicle franchises.  See O.C.G.A § 10-1-650 et seq.; see also Nissan N.

Am., Inc. v. Walker-Jones Nissan, LLC, 812 S.E.2d 130, 133–34 (Ga. Ct. App. 2018).  Pertinent

to this case, O.C.G.A. § 10-1-653 (the "Transfer Statute") provides:

> If a . . . dealer desires to make a change in . . . ownership or to sell its principal
> assets, [it] will give the franchisor prior written notice of the proposed change or
> sale.  The franchisor *shall not arbitrarily refuse to agree* to such a proposed change
> or sale or withhold approval of such change or sale unless *the franchisor can prove
> that its decision is not arbitrary and that the new . . . owner . . . is unfit or
> unqualified to be a dealer* based on the franchisor's prior written, reasonable,
> objective, and uniformly applied, within reasonable classifications, standards
> which directly relate to the prospective transferee's business experience, moral

character, and financial qualifications. . . .  Where the franchisor rejects a proposed change or sale, the franchisor shall give written notice of his reasons to the [dealer] within 60 days.  If no such notice is given to the [dealer], the change or sale shall be deemed approved.

O.C.G.A. § 10-1-653 (emphasis added).  "In other words, to comply with the [Transfer Statute], a franchisor is prohibited from rejecting a dealer's proposal to sell unless the franchisor can demonstrate both that its decision is not arbitrary and that the potential purchaser is unqualified." Gen. Motors LLC v. Canton Motors Sales, Inc., Nos. 1:12-cv-01994-JEC, 1:12-cv-02201-JEC, 2014 WL 901430, at *5 (N.D. Ga. Mar. 7, 2014) (citing O.C.G.A. § 10-1-653); see Nissan N. Am., Inc., 812 S.E.2d at 133–34 ("The Transfer Statute provides a mechanism for a franchisor . . . to reject . . . a proposed sale of the dealership if the franchisor can show that its decision is not arbitrary and that the proposed new manager, owner, or buyer is unfit or unqualified according to the franchisor's preexisting standards.").

## II.    The Parties' Motions for Summary Judgment

Volkswagen moves for summary judgment on several topics: (1) that it reasonably withheld its consent to the Proposed Transfer under the Transfer Statute and the Dealer Agreement; (2) that Peacock RE lacks standing to bring suit; and (3) that Volkswagen did not cause Plaintiffs' alleged damages.  (See doc. 43-1, pp. 12–25.)  Plaintiffs argue they are entitled to summary judgment because Volkswagen did not comply with the Transfer Statute or the Dealer Agreement, as a matter of law, when it withheld its consent to the Proposed Transfer.  (Doc. 50-1, pp. 4–7, 24.) Specifically, Plaintiffs argue that the Operational Acumen and Financial Capacity Standards were not uniformly applied, (id. at pp. 5–7, 11–12), that the Operational Acumen Standard was not reasonable or objective, (id. at pp. 5–7), and that, regardless, Step One satisfied the Operational Acumen and Financial Capacity Standards, (id. at pp. 7–10).

16

### A.      Standing

Because standing is a "threshold question in every federal case" that determines "the power of the court to entertain the suit," CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)), the Court first addresses the parties' arguments regarding Peacock RE's standing to pursue its claims against Volkswagen.  See Ctr. for Biological Diversity v. Tenn. Valley Auth., 491 F. Supp. 3d 1180, 1185 (N.D. Ala. 2020) ("As a threshold matter, the Court must first address TVA's argument that the plaintiffs lack Article III standing to bring this lawsuit.").  Volkswagen argues that Peacock RE lacks standing to pursue its claims against Volkswagen because Peacock RE (1) does not own the Dealership Land, (2) is not granted standing by the Transfer Statute, and (3) is not a party to the Dealer Agreement.  (Doc. 43-1, pp. 21–24.)  Plaintiffs argue that Peacock RE has standing to bring an action for violation of the Transfer Statute because Peacock RE does own the Dealership Land, and the Transfer Statute grants standing to Peacock RE.[9]  (Doc. 50-1, pp. 19–21.)

### (1)      Peacock RE's Interest in the Dealership Land

First, Volkswagen argues that Peacock RE lacks standing because Peacock RE does not own the Dealership Land.  (Doc. 43-1, pp. 21–22.)  To support this assertion, Volkswagen contends that the property tax records for the Dealership Land indicate that an entity named Savannah Motorcars RE LLC ("Savannah Motorcars RE") owns the Dealership Land.  (Id.; see also doc. 43-21, pp. 5–26.)  Plaintiffs generally respond that Savannah Motorcars RE is the same entity as Peacock RE.  (Doc. 50-1, pp. 19–20.)  Specifically, according to Plaintiffs, Savannah Motorcars

---

[9] Plaintiffs concede that Peacock RE is "not a party to the Dealer Agreement" and that "[t]he claim alleging breach of the [D]ealer [A]greement was only brought by [Plaintiff Savannah Motorcars]."  (Doc. 50-1, p. 19 n.9.)  Indeed, Count II of the Amended Complaint explicitly alleges only that Savannah Motorcars suffered damage and that Savannah Motorcars alone demands an entry of judgment against Volkswagen as a result of the alleged breach of contract.  (See doc. 70, p. 7.)

RE, along with other Florida entities, merged into Coastal States RE, LLC ("Coastal States RE") on February 25, 2016 (the "Merger").  (Id.)  Plaintiffs then contend that, in accordance with Florida law, ownership of the Dealership Land vested in Coastal States RE as the surviving entity from the Merger.  (Id. at pp. 19–20.)  Then, on November 9, 2016, Coastal States RE changed its name to Peacock RE.  (Id. at p. 20.)

The Court finds that Volkswagen is not entitled to summary judgment on this ground because sufficient evidence indicates that Peacock RE owns the Dealership Land.  As Plaintiffs contend, the Articles of Merger and Name Change Amendment from the Florida Secretary of State indicate that Savannah Motorcars RE, a Florida limited liability company, merged into Coastal States RE, a Florida limited liability company, which subsequently changed its name to Peacock RE.[10]  (See doc. 52-1, pp. 10–18.)  While the parties dispute whether Georgia law or Florida law determines whether Peacock RE LLC, as the surviving entity of the Merger, obtained ownership of the Dealership Land, Georgia law and Florida law appear to reach the same conclusion: Peacock RE LLC owns the Dealership Land.  See O.C.G.A. § 14-11-905(a)(3); Fla. Stat. § 605.1026(1)(c).  Indeed, under the Georgia Limited Liability Company Act ("GLLCA"), "[w]hen a merger [governed by the GLLCA] takes effect . . . [t]he title to all real estate and other property owned by each constituent business entity is vested in the surviving limited liability company without

---

[10]  The Court takes judicial notice of the Articles of Merger and Name Change Amendment pursuant to Federal Rule of Civil Procedure 201.  See Learning Connections, Inc. v. Kaufman, Englett & Lynd, PLLC, No. 6:11-cv-368-Orl-119GJK, 2012 WL 13103015, at *6 (M.D. Fla. Jan. 18, 2012) (taking judicial notice of documents from Tennessee Secretary of State because "official documents from the Secretary of State possess the 'requisite level of reliability' required for a court to take judicial notice"); Vista Expl. Co. v. Mewbourne Oil Co., No. CIV-10-213-C, 2010 WL 1980196, at *2 n.3 (W.D. Okla. May 17, 2010) (taking judicial notice of public records kept with Oklahoma Secretary of State); Global Elec. Sols., Inc. v. Energy Automation Sys., Inc., No. 3:08-00619, 2009 WL 463981, at *2 (M.D. Tenn. Feb. 23, 2009) (taking judicial notice of public filings from the Texas Secretary of State); see also Univ. Express, Inc. v. S.E.C., 177 F. App'x 52, 53 (11th Cir. 2006) ("Public records are among the permissible facts that that a district court may consider.").

reversion or impairment." O.C.G.A. § 14-11-905(a)(3). Likewise, under Florida law, "[w]hen a merger becomes effective . . . [a]ll property of each merging entity vests in the surviving entity without transfer, reversion, or impairment." Fla. Stat. § 605.1026(1)(c). Moreover, O.C.G.A. § 14-11-905(b) provides that "[i]f the surviving business entity [of a merger] is to be governed by the laws of any jurisdiction other than this state, the effects of merger shall be the same provided as in this Code section, *except insofar as the laws of such other jurisdiction provide otherwise*." O.C.G.A. § 14-11-905(b) (emphasis added). Thus, regardless of whether Florida or Georgia law governs the Merger, ownership vested in Peacock RE LLC (formerly Coastal States RE) following the Merger.

To the extent Volkswagen attacks Peacock RE's standing by arguing that the merger was somehow ineffective or incomplete because no articles of merger were filed pursuant to O.C.G.A. § 14-11-904,[11] (doc. 59, p. 25), the Court notes that, even if Georgia law applies to the Merger, nothing in O.C.G.A. § 14-11-904 appears to apply to the merger of two foreign limited liability companies (where no Georgia limited liability company is involved). See O.C.G.A. § 14-11-901 *et seq.* Indeed, O.C.G.A. § 14-11-904 appears to only apply when a Georgia limited liability company is involved in the at-issue merger. See O.C.G.A. §§ 14-11-901, 14-11-903, 14-11-904. While Georgia law requires foreign limited liability companies transacting business in Georgia to procure a Certificate of Authority from the Georgia Secretary of State, see O.C.G.A. § 14-11-702(a), the Court cannot find any authority for the proposition that Georgia requires the surviving entity of a merger involving only foreign limited liability companies to file articles of merger with the Georgia Secretary of State, see O.C.G.A. § 14-11-901 *et seq.* Thus, the Court concludes that

---

[11] O.C.G.A. § 9-11-904 provides, in part, "[a]fter a plan of merger is approved as provided in [O.C.G.A. §] 14-11-903, the surviving limited liability company or other business entity shall deliver to the Secretary of State for filing articles of merger[.]" O.C.G.A. § 9-11-904.

Plaintiffs have presented sufficient evidence to show that Peacock RE possesses an ownership interest in the Dealership Land and, accordingly, rejects Volkswagen's argument that Peacock RE lacks standing on this basis.

### (2)   Peacock RE's Standing under the Transfer Statute & Article III

Concerning standing under the Transfer Statute, the Act provides that "*any person who is or may be injured* by a violation of a provision of this article . . . may bring an action in any court of competent jurisdiction for damages and equitable relief."  O.C.G.A. § 10-1-623(a) (emphasis added).  The Act defines "person" as "every natural person, partnership, corporation, association, trust, estate, or any other legal entity."  O.C.G.A. § 10-1-622(13).  Thus, to the extent Volkswagen argues that the Transfer Statute does not grant standing to Peacock RE because Peacock RE is not a "dealer" under the Act, (see doc. 59, p. 26), the plain, unambiguous language of the Transfer Statute clearly contradicts that argument.  See O.C.G.A. § 10-1-623(a); see also Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am., Inc., 32 F.3d 528, 531 (11th Cir. 1994) ("The rules of statutory construction dictate that when the language of a statute is clear and unambiguous and conveys a clear and definite meaning, the statute must be given its plain and ordinary meaning.  Absent an ambiguity, the statute's plain meaning prevails. . . .  The use of the phrase 'any person' does not lend itself to ambiguity and this court finds none.  The statute's plain meaning controls, and, accordingly, we find that the statute grants a potential franchisee standing to bring suit.") (internal quotations and citations omitted).

However, the Court's analysis does not end there because "standing in federal court is a question of federal law, not state law.  And no matter its reasons, the fact that a State thinks a private party should have standing to seek relief for a generalized grievance cannot override our settled law to the contrary."  Hollingsworth v. Perry, 570 U.S. 693, 715 (2013).  Indeed, "States

cannot . . . issue[] to private parties who otherwise lack standing a ticket to the federal courthouse." Id.; see In re Cmty. Health Sys., Inc., No. 15-CV-222-KOB, 2016 WL 4732630, at *17–19 (N.D. Ala. Sept. 12, 2016) (finding that state statutes did not provide separate bases for Article III standing); see also generally Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 933 (11th Cir. 2020) ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").  Article III of the United States Constitution limits the power of federal courts to adjudicating actual "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1.  The most significant case-or-controversy doctrine is the requirement of standing.  See Ga. State Conf. of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999).  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Nat'l All. for the Mentally Ill, St. Johns Inc. v. Bd. of Cty. Comm'rs, 376 F.3d 1292, 1294 (11th Cir. 2004) (quoting Warth, 422 U.S. at 498).  The party seeking to invoke federal jurisdiction carries the burden to establish that it has standing to assert its claim.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

"There are at least three distinct forms of standing: taxpayer standing, individual standing, and organizational standing." Nat'l Alliance for the Mentally Ill, 376 F.3d at 1294.  To establish standing under any of these forms, a plaintiff must satisfy three requirements: "(1) injury-in-fact; (2) a causal connection between the asserted injury-in-fact and the challenged action of the defendant; and (3) that the injury will be redressed by a favorable decision." Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1328 (11th Cir. 2013) (internal quotation marks omitted) (quoting Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001)).  A plaintiff may not proceed in federal court without establishing these three requirements at the outset.

To meet the injury-in-fact requirement, a plaintiff must have suffered an invasion of a legally protected interest which is: (1) "concrete and particularized," meaning the alleged injury affects the plaintiff "in a personal and individual way"; and (2) "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560, 560 n.1 (internal quotation marks). To be "concrete," an injury "must be '*de facto*'; that is, it must actually exist." Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016). While a legislature's judgment "may be 'instructive and important' to this Court's analysis, [the Court] need[s] to come to its own conclusion that the alleged harm is concrete." Muransky, 979 F.3d at 925. Evidence, "which for purposes of the summary judgment motion will be taken as true," Lujan, 504 U.S. at 561, shows that Peacock RE suffered a concrete and actual injury. Peacock RE contractually agreed in the Savannah APA to sell its "respective right, title and interest" in the Dealership Land to Step One. (See doc. 43-3, p. 129; see also id. at p. 169.) The sale did not close (allegedly due to Defendant's actions), and Peacock RE did not receive the sale price contemplated in the Savannah APA. (Id. at p. 169.) Therefore, Peacock RE has alleged a concrete and actual injury in the financial loss resulting from the Proposed Transfer's failure to close. See Muranksy, 979 F.3d at 926 ("Plaintiffs can show a concrete . . . harm in two ways. The first is to show that the statutory violation itself caused a harm. . . . [P]ointing to a direct harm is the most straightforward way to show a concrete injury[.] . . . Tangible harms are the most obvious and easiest to understand; physical injury or *financial loss* come to mind as examples.") (emphasis added); see also Debernadis v. IQ Formulations, LLC, 942 F.3d 1076, 1088 (11th Cir. 2019) (finding that the sale of a worthless product "that Congress judged insufficiently safe for human ingestion" deprived the plaintiffs of the benefit of the bargain and amounted to a direct economic loss that supported standing). Indeed, Volkswagen does not appear to contend that

Peacock RE did not suffer an injury in fact but rather that Peacock RE's injury is not traceable to Volkswagen.  (See doc. 43-1, pp. 21–24; doc. 59, pp. 26–27.)

However, sufficient evidence tends to show that the injury Peacock RE allegedly sustained is "fairly traceable to the challenged conduct" of Volkswagen.  Muransky, 979 F.3d at 924.  An injury is fairly traceable to a defendant "when the claimed injury flows from [the] defendant's conduct."  Kimberly ReGensis, LLC v. Lee County, No. 2:19-cv-538-FtM-38NPM, 2020 WL 758099, at *8 (M.D. Fla. Feb. 14, 2020) (citing Mulhall v. UNITE HERE Local 355, 618 F.3d 1279, 1290 (11th Cir. 2020)).  "Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement."  Resnick v. AvMed, Inc., 693 F.3d 1317, 1324 (11th Cir. 2012).  Indeed, the fairly traceable requirement "requires less than a showing of proximate cause."  Id. (quotations omitted).  "A plaintiff therefore need not show . . . that 'the defendant's actions are the very last step in the chain of causation.'"  Wilding v. DNC Servs. Corp., 941 F.3d 1116, 1126 (11th Cir. 2019) (quoting Bennett v. Spear, 520 U.S. 154, 168–69 (1997)).  In the Savannah APA, Peacock RE contracted to sell its interest in the Dealership Land, (see doc. 43-3, p. 129), and evidence suggests that Volkswagen's refusal to consent to the Proposed Transfer (and thus, its purported failure to abide by the Transfer Statute) prevented the completion of the sale, see Discussion Section II.D.2, infra.  To the extent Volkswagen argues that Peacock RE's alleged injury was caused by Step One because "Step One did not have manufacturer approval from the manufacture[r]s implicated in the Brunswick APA," (doc. 43-1, p. 25), Step One testified, to the contrary, that the Savannah APA was the only factor preventing the Brunswick APA from closing.  (Doc. 50-7, p. 37.)  Thus, Peacock RE's injury is "fairly traceable" to Volkswagen.  Additionally, although Volkswagen contends that "any potential harm suffered by Peacock RE cannot be traced to [Volkswagen]" because Peacock is not a "dealer" under the [Transfer Statute],"

this argument is inapposite.  (Doc. 43, p. 23.)  As noted above, federal law—and not state law—determines whether a plaintiff has Article III standing.  Perry, 570 U.S. at 715.  Moreover, the fact that Peacock RE is not a "dealer" for purposes of the Transfer Statute does not negate the evidence reasonably suggesting that Peacock RE's injury is "fairly traceable" to Volkswagen; namely, that the sale of Peacock RE's interest in the Dealership Land contemplated in the Savannah APA depended on Volkswagen consenting to the Proposed Transfer, and Volkswagen's refusal to consent to the Savannah APA prevented that sale from occurring.  Lastly, the Court finds that the redressability prong is met because "financial loss . . . is a paradigmatic example of an injury in fact that is redressable by a favorable judicial decision."  Pincus v. Am. Traffic Sols., Inc., 986 F.3d 1305, 1310 n.7 (11th Cir. 2021).   Thus, the Court finds Volkswagen is not entitled to summary judgment on the issue of standing.

> **B.**     **Reasonableness of Volkswagen Withholding Consent**

Volkswagen next generally argues that it is entitled to summary judgment as to all claims against it because it reasonably withheld its consent to the Proposed Transfer in accordance with the Transfer Statute and the Dealer Agreement.  (Doc. 43-1, pp. 12–21.)  According to Volkswagen, it reasonably withheld its consent to the Proposed Transfer because (1) Step One did not timely submit dealer application documents to Volkswagen, (id. at pp. 12–17); (2) Plaintiffs unlawfully thwarted Volkswagen's right of first refusal, (id. at pp. 17–19); and (3) Step One did not satisfy Volkswagen's "written, reasonable, and uniformly applied" policies on financial capitalization or operational acumen, (id. at pp. 19–21).  Plaintiffs argue that they are entitled to summary judgment on both counts because Step One satisfied Volkswagen's Dealer Candidate Policies.  (Doc. 50-1, pp. 7–10, 24.)

### (1)   Timeliness of Requested Documents

Volkswagen first argues that it properly withheld its consent to the Proposed Transfer under the Transfer Statute and the terms of the Dealer Agreement "based on the undisputed fact that Step One failed to submit application documents to [Volkswagen] in a sufficient time to allow [Volkswagen] to evaluate its qualifications." (Doc. 43-1, p. 12.)  As stated in Discussion Section I.A, supra, the Transfer Statute provides that a "franchisor shall not . . . refuse to agree to [a] proposed . . . sale . . . unless the franchisor can prove" (1) that its decision is "not arbitrary" and (2) that the proposed transferee "is unfit or unqualified to be a dealer based on the franchisor's prior written, reasonable, objective, and uniformly applied . . . standards or qualifications [that] directly relate to the prospective transferee's business experience, moral character, and financial qualifications."  O.C.G.A. § 10-1-653; see Gen. Motors LLC, 2014 WL 901430, at *5 ("In other words, to comply with the above statute, a franchisor is prohibited from rejecting a dealer's proposal to sell unless the franchisor can demonstrate both that its decision is not arbitrary and that the potential purchaser is unqualified.") (citing O.C.G.A. § 10-1-653).  If the franchisor refuses to consent to a sale, the franchisor must give written notice of its reasons to the dealer within sixty days.  O.C.G.A. § 10-1-653.

Similarly, under the Dealer Agreement, Volkswagen must "consider in good faith" any transfer proposal Savannah Motorcars submits to it. (Doc. 43-3, p. 108; see also doc. 43-2, p. 7; doc. 50-2, p. 4.)  In determining whether to approve a proposed transfer, the Dealership Agreement requires Volkswagen to consider "the personal, business, and financial qualifications of the proposed new owners and executives as well as the proposal's effect on competition." (Doc. 43-3, p. 108; see also doc. 43-2, p. 7; doc. 50-2, p. 4.)   Additionally, Volkswagen must notify Savannah Motorcars in writing of its approval or disapproval of a proposed transfer within 45

business days after Savannah Motorcars has "furnished to [Volkswagen] all applications and information reasonably requested by [Volkswagen] to evaluat[e]" the proposal.  (Doc. 43-3, p. 108; see also doc. 43-2, p. 7; doc. 50-2, p. 5.)

According to Volkswagen, for it to have evaluated the Proposed Transfer as required by the Transfer Statute and the Dealer Agreement, it needed "information and documents from [Step One] about its 'business experience, moral character, and financial qualifications.'"  (Doc. 43-1, pp. 12–13 (quoting O.C.G.A. § 10-1-653).)   In other words, Volkswagen argues that "the submission of application documents is a necessary prerequisite to obtaining [Volkswagen's] approval of a proposed transfer."  (Id. at p. 13.)  Plaintiffs argue that the Transfer Statute "does not permit . . . rejection based upon a transferee's failure to submit all of the documents demanded by a franchisor in a timeframe deemed acceptable by the franchisor."  (Doc. 50-1, p. 13.)  Plaintiffs further argue that even if the Transfer Statute required them to provide all the information Volkswagen required in a timelier manner, questions of fact exist as to how much time Volkswagen needed to evaluate the information and what information Volkswagen needed.  (Id. at pp. 14–15.)  Finally, Plaintiffs argue that the "alleged untimeliness of document submission by Step One cannot be a defense to the breach of contract action."  (Id. at p. 24.)

Even assuming that the Transfer Statute required Step One and Plaintiffs to provide all the information Volkswagen reasonably requested in a timelier manner, the Court finds that a genuine dispute of material fact remains as to whether Volkswagen received all the information it needed to make a decision about the Proposed Transfer and whether Volkswagen received that information in sufficient time to make that decision.  For example, while Gordon Munroe (Volkswagen's senior manager of regional network operations) testified that Volkswagen "never got to do enough due diligence" or engage in sufficient "dialogue," he also testified that after October 17, 2018,

Volkswagen received the "documents" it needed to "properly evaluate the Proposed Transfer on its merits," except for "some minor things in the end." (Doc. 50-4, pp. 99–102.) Furthermore, Sauls testified on behalf of Step One that after Step One received the First Rejection Letter, which Munroe characterized as a "soft turndown," (id at p. 105), Step One "got very busy getting documents together," (doc. 43-4, p. 33), and the parties agree that Step One submitted those documents to Volkswagen, (doc. 43-2, p. 18; doc. 50-2, p. 13). Emails exchanged between Volkswagen and Step One indicate that these documents concerned, among other things, Step One's investors, trustees, and manager, (doc. 43-6), the sales performances of Step One's automotive dealerships, (doc. 43-8), and the sources of funds for the Proposed Transfer, (id.). Moreover, while Volkswagen argues it never received clarifying information related to Step One's "financial qualifications," (doc. 43-1, p. 13), the testimony from Sauls' deposition that Volkswagen relies on for this assertion states only that Step One "did not know" if it ever provided Volkswagen with the clarifying information. (See doc. 43-4, p. 37.) Finally, the fact that Volkswagen made a determination of the Proposed Transfer on the merits in the Second Rejection Letter further indicates that Volkswagen possessed sufficient information about Step One to evaluate the Proposed Transfer, including information about Step One's financial qualifications. Specifically, the Second Rejection Letter states that "[t]he information provided indicates [Step One's] Volkswagen dealership in Florida is severely underperforming and that the majority of [its] other dealerships have severe to below average sales performance." (Doc. 43-2, p. 21; doc. 50-2, p. 18.) Thus, based on the foregoing, a reasonable jury could conclude that Volkswagen possessed sufficient information about Step One to properly evaluate the Proposed Transfer under the Transfer Statute and the Dealer Agreement.

Furthermore, a reasonable jury could also conclude that Volkswagen had sufficient time to properly evaluate the Proposed Transfer. While Monroe testified that Volkswagen did not have an opportunity to conduct "enough due diligence," (doc. 50-4, p. 100), and the Second Rejection Letter stated that Volkswagen did not have sufficient time to evaluate the Proposed Transfer, (doc. 43-2, p. 21), Volkswagen did conduct some form of a merits evaluation because Volkswagen informed Step One that it did not satisfy the Operational Acumen and Financial Capacity Standards, (id. at p. 21; see doc. 50-2, p. 18). Moreover, evidence indicates that Volkswagen could quickly conduct a merits review because the merits review Volkswagen did conduct (which was one of the bases for disapproval as stated in the Second Rejection Letter) only took a few days to conduct. Indeed, Volkswagen received documents from Step One after October 17, 2018, and sent the Second Rejection Letter on October 26, 2018, with five days still remaining before the Closing Date. Thus, a jury could conclude that Volkswagen had sufficient time to conduct a proper evaluation of the Proposed Transfer after it received the documents from Step One.

Accordingly, the Court finds that Volkswagen is not entitled to summary judgment on either count based on this ground.

### (2)    Right of First Refusal

Volkswagen next argues it is entitled to summary judgment because Plaintiffs "wrongfully thwarted" its statutory and contractual rights of first refusal. (Doc. 43-1, pp. 17–19.) Specifically, Volkswagen contends that Plaintiffs and Step One interfered with its rights of first refusal by failing to provide certain information Volkswagen requested, such as information regarding the allocation of the purchase price among the different assets and liabilities pertaining to the Dealership. (Id. at p. 18.) Plaintiffs respond that "the failure to allocate the purchase price in a

manner deemed acceptable by a franchisor is not a basis for rejection under the [Transfer Statute]." (Doc. 50-1, p. 17.)

Under the Act, an automobile franchisor, such as Volkswagen, is "permitted to exercise a right of first refusal to acquire a dealer's assets or ownership, in the event of a proposed change of ownership, or transfer of dealership assets" if certain requirements are met.  O.C.G.A. § 10-1-663.1(a); see Nissan N. Am., Inc., 812 S.E.2d at 134–35.  However, the Transfer Statute and O.C.G.A. 10-1-663.1(a) "operate independently."  Nissan N. Am., Inc., 812 S.E.2d at 135; see Mercedes-Benz USA, LLC v. Star Auto. Co., No. 3:11-cv-73 (CAR), 2011 WL 2791076, at *1 (M.D. Ga. July 15, 2011) ("The [Transfer Statute] operates independently from the right of refusal; the provisions are not contradictory.  Indeed, the provisions co-exist . . . .").  Under the Transfer Statute, Volkswagen must show that its decision to withhold its consent of the Proposed Transfer "is not arbitrary and that [Step One] is unfit or unqualified according to [Volkswagen's] preexisting standards."  Nissan N. Am., Inc., 812 S.E.2d at 133–34.  Volkswagen has failed to cite to—and the Court's own independent research has not discovered—any binding legal authorities permitting a franchisor to avoid its obligations under the Transfer Statute because the franchisor believed its right of first refusal was thwarted.  (See doc. 43-1, pp. 17–19; doc. 59, pp. 12–15.) While evidence that Volkswagen's right of first refusal was interfered with may show that Volkswagen's decision to reject the Proposed Transfer was not arbitrary, see Hickman v. Am. Honda Motor Co., Inc., 982 F. Supp. 881, 883 (N.D. Ga. 1997) (finding that auto manufacturer did not act arbitrarily when it withheld consent of a proposed transfer of an automobile dealership for reasons unrelated to the proposed transferee's qualifications), Volkswagen has not made any argument that interference with the right of first refusal rendered Step One "unfit or unqualified"

under the Transfer Statute.  (See doc. 43-1, pp. 17–19; doc. 59, pp. 12–15.)  Thus, the Court finds

that Volkswagen is not entitled to summary judgment on either count on this ground.

**(3)**     **Operational Acumen and Financial Capacity Standards**

Volkswagen next argues that it is entitled to summary judgment because Step One did not

meet the requirements for Operational Acumen and Financial Capacity Standards set forth in its

Dealer Candidate Policies.  (Doc. 43-1, pp. 19–21.)  Plaintiffs argue that they are entitled to

summary judgment because Step One satisfied the Operational Acumen and Financial Capacity

Standards.  (Doc. 50-1, pp. 7–10.)  Regarding the Operational Acumen Standard, Volkswagen

examines "2 years plus the latest available year-to-date data regarding" a prospective transferee's

"performance operating a retail automotive outlet."  (Doc. 43-3, p. 122; see also doc. 43-2, p. 8;

doc. 50-2, p. 6.)  Pertinent to this case, two factors Volkswagen considers under the Operational

Acumen Standard are a candidate's demonstrated ability "to exceed expected level of sales in a

market area, as measured by sales index, sales effectiveness, market share, or similar metric" and

"to profitably operate a retail automotive outlet as evidenced by past and most current financial

statements."  (Doc. 43-3, p. 122.)

Concerning the Financial Capacity Standard, Volkswagen examines a candidate's "ability

to meet or exceed capitalization requirements for the planning volume of the proposed

Dealership."  (Id.; see also doc. 43-2, p. 9; doc. 50-2, p. 6.)  Furthermore, Volkswagen mandates

that "the operating investment for any application package consists of a maximum one-to-one ratio

of borrowed-to-owned capital."  (Doc. 43-3, p. 122.)  In addition, the Capitalization Policy

provides that the "[i]nvestment of unencumbered personal capital should be adequately verified"

and that the "Dealership must maintain a debt-to-equity ratio of 1:1; or, at least 50% of working

capital must be in the form of unencumbered funds."  (Id. at pp. 124–25; see also doc. 43-2, p. 9;

30

doc. 50-2, p. 6.)  The Capitalization Policy further states that "[b]alloon payment loans and *lines of credit* such as 'revolving credit lines' . . . are not acceptable replacement for a fixed term capital loan." (Doc. 43-3, p. 124 (emphasis added).)

The Court finds that genuine disputes of material fact exist as to whether Step One satisfied the Operational Acumen and Financial Capacity Standards.  Regarding the Business Acumen Standard, Volkswagen examined sales data submitted by Step One reflecting the sales performances at several auto dealerships Step One operated.  (See doc. 60, pp. 5–6; see also doc. 50-11, pp. 2–6 (sealed exhibit).)  On the one hand, the sales data indicated that the majority of dealerships Step One operated ███████████████████████, but on the other hand, █ ████████████████████████████████████████ (Doc. 60, p. 12; doc. 50-11, pp. 2–4 (sealed exhibit).)  Furthermore, one of the █████████████████████ was located in Savannah, Georgia, approximately one mile from the Dealership.  (Doc. 60, pp. 12–14; doc. 50-11, pp. 2–4 (sealed exhibit).)  Thus, based on the foregoing, a reasonable jury could conclude that Step One satisfied Volkswagen's requirement that it show an "ability to exceed expected level of sales in a market area." (Doc. 43-3, p. 122.)

Regarding the Financial Capacity Standard, a letter dated October 24, 2018, from Step One's counsel describes Step One's structure of the Proposed Transfer.  (Doc. 50-4, p. 164; doc. 50-7, p. 42; see also doc. 50-11, p. 33 (sealed exhibit).)  Specifically, the October 24, 2018, letter indicates that Step One was going to assign its right to purchase the Dealership to an entity named Step One Automotive VW SV, LLC ("Step One SV").  (Doc. 50-4, p. 164; doc. 50-7, p. 42; see also doc. 50-11, p. 33 (sealed exhibit).)  According to the October 24 letter, Step One SV had two members: CInvestments FL, LLC, and Corma Automotive, LLC (the "Members").  (Doc. 50-4, p. 165; doc. 50-7, p. 42; see also doc. 50-11, p. 33 (sealed exhibit).)  The Members' capital

contributions in Step One SV totaled $12,915,000 (the "Initial Capital Contribution").  (Doc. 50-4, p. 165; doc. 50-7, p. 42; see also doc. 50-11, p. 33 (sealed exhibit).)  The letter further indicates that JCCM 2017 Family Trust (US) and MICM 2017 Family Trust (US) were the sole owners of Corma Automotive, LLC and that Corma Automotive, LLC was the sole owner of Cinvestments FL, LLC.[12]  (Doc. 50-4, pp. 166–67; see also doc. 50-11, p. 35 (sealed exhibit).)  Furthermore, the letter indicates that ███████████████████████████████████████████████████████ ████████████████████████████████████████████ (Doc. 50-11, p. 34 (sealed exhibit).)  Thus, while the Source of Funds statements state ███████████████████████████████, (doc. 50-11, pp. 36–37 (sealed exhibit)), the October 24 letter appears to clarify that there was no loan between Step One SV and the Members.  (Doc. 50-4, pp. 176–78; doc. 50-7, p. 43; see also doc. 50-11, pp. 33–37 (sealed exhibit).)  Instead, the Source of Funds Statements indicate █████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████ (Doc. 50-11, pp. 36–37 (sealed exhibit); see also doc. 50-4, pp. 176–77.)  Furthermore, Kelly testified that ████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████ (Doc. 50-12, pp. 26, 29 (sealed exhibit).)  Therefore, a question of fact exists as to whether these sources of funds constitute "credit lines" in violation of the Financial Capacity Standard.  A question of fact also exists as to whether Step One satisfied the debt-to-

---

[12]  The Source of Funds Statements dated October 12, 2018, ████████████████████████ ████████████████████ controlled the Trusts.  (Doc. 50-11, pp. 36–37 (sealed exhibit); see doc. 50-4, pp. 176–77.)  Furthermore, the Source of Funds Statements state that █████████████████████████ ████████████████████████████████████████ (Doc. 50-11, pp. 36–37 (sealed exhibit); see doc. 50-4, pp. 176–77.)

equity ratio required by the Financial Capacity Standard.  While the Source of Funds statements

███████████████████████████████████████████████████, (doc. 50-11, pp. 36–37

(sealed exhibit)), the Pro Forma Balance sheet Step One submitted to Volkswagen ████████

████████████████████████████████████, (doc. 50-12, pp. 39, 49 (sealed

exhibit); see also doc. 60, p. 17).  Indeed, Munroe testified that documents indicated that the

projected debt-to-equity ratio of Step One SV satisfied the Financial Capacity Standard.  (See doc.

50-4, p. 183.)

Based on the foregoing, the Court concludes that neither Volkswagen nor Plaintiffs are

entitled to summary judgment on this ground.

## C. Uniform Applicability, Reasonableness, and Objectiveness of the Dealer Candidates Policies

Plaintiffs argue that they are entitled to summary judgment because, as a matter of law,

Volkswagen did not comply with the Transfer Statute when it relied on the Dealership Candidate

Policies to withhold its consent to the Proposed Transfer.  (Doc. 50-1, pp. 4–7.)  Specifically,

Plaintiffs argue that the Operational Acumen and Financial Capacity Standards were not uniformly

applied, (id. at pp. 5–7, 11–12), and that the Operational Acumen Standard was not reasonable or

objective, (id. at pp. 5–7).  The Court finds that summary judgment is inappropriate because issues

of material fact exist as to the uniform application of these factors and the reasonableness and

objectiveness of the Operational Acumen Standard.

### (1) Uniform Applicability

Concerning uniform applicability, Plaintiffs argue that Volkswagen "does not reject every

proposed transferee who has poor sales performance at one or more of its existing dealerships,"

(id. at p. 6), and that Volkswagen "has approved other proposed transferees with identical

capitalization structures" as the Proposed Transfer, (id. at p. 11).  However, a reasonable jury could

33

conclude that the other approved transfers were sufficiently different from the Proposed Transfer. For example, concerning the approval of transferees with past sales performance issues, Kelly testified that Volkswagen only approved those transfers once the prospective transferees signed settlement agreements to address those performance concerns, which in one case required the prospective transferee to divest an existing, underperforming Volkswagen dealership and correct undercapitalization issues at two other dealerships.  (See doc. 50-12, pp. 23–25 (sealed exhibit).) Furthermore, Kelly testified that another transfer approved by Volkswagen involved a prospective transferee who operated one underperforming store but also operated four "sales effective" stores. (Id. at p. 24.)  Thus, a reasonably jury could conclude that Step One's sales performance (████████ ██████████████████████████) is sufficiently different from this Volkswagen-approved transfer.  Furthermore, considering an issue of fact exists as to what Step One's exact capital structure for the Proposed Transfer was in this case, see Discussion Section II.B.3, supra, the Court cannot rule as a matter of law that Volkswagen failed to uniformly apply its Financial Capacity Standard in this case.

**(2)     Reasonableness and Objectivity of the Operational Acumen Standard**

Concerning Plaintiff's argument that the Operational Acumen Standard is not reasonable or objective, the Court is not persuaded.  The Transfer Statute states, in relevant part, that a franchisor may not withhold approval of a sale unless it can "prove that . . . [the transferee] is unfit or unqualified . . . based on the franchisor's prior, written, *reasonable, objective*, and uniformly applied . . . standards or qualifications which directly relate to the prospective transferee's business experience, moral character, and financial qualifications." O.C.G.A. § 10-1-653 (emphasis added). Thus, the Transfer Statute requires that Volkswagen use objective and reasonable standards or qualifications.  See id.  Here, factors that Volkswagen considers under the Operational Acumen

Standard include a prospective transferee's demonstrated ability: (1) "to exceed expected level of sales in a market area, as measured by sales index, sales effectiveness, market share, or similar metric"; (2) "to exceed customer needs, as measured by customer satisfaction index (CSI) scores or similar metric"; and (3) "to profitably operate a retail automotive outlet as evidenced by past and most current financial statements."  (Doc. 43-3, p. 122.)  Volkswagen also considers the prospective transferee's "[a]bility to obtain a license to operate a retail automotive outlet."  (Id.)  When evaluating a candidate's "ability to exceed expected level of sales in a market area," Volkswagen considers sales indexes, sales effectiveness, market shares, and "similar metrics." (Id.)  Plainly, these criteria are "objective."  See O.C.G.A. § 10-1-653; see also, e.g., Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc., 51 F.3d 235, 237 (11th Cir. 1995) ("It is axiomatic that the interpretation of a statute must begin, and usually ends, with the text of the statute.  When interpreting the text, [courts] give undefined terms their plain, ordinary, and most natural meaning.") (internal citations omitted).  Indeed, in this case, Volkswagen considered Step One's sales performances at other dealerships based on sales data.  (See doc. 43-23, pp. 2–10 (sealed exhibit); see also doc. 43-2, p. 18; doc. 50-2, p. 13.)  While Plaintiffs contend that Volkswagen's ██████████ to examining prospective transferees renders its Operational Acumen Standard violative of the objectiveness requirement, (doc. 50-1, pp. 5–6), nothing in the Transfer Statute prohibits a franchisor from viewing information and data about a prospective transferee in such a manner.  See O.C.G.A. § 10-1-653.  The plain text of the Transfer Statute requires Volkswagen to simply base its decision on objective standards.  See id.  A ██████████ in which Volkswagen examines objective factors "in the context of . . . all the other information" Volkswagen receives about the proposed transferee, (doc. 50-12, p. 17 (sealed exhibit); doc. 60, p. 7), does not necessarily violate that requirement.  See O.C.G.A. § 10-1-653.

Plaintiffs next argue that they are entitled to summary judgment because Volkswagen's "measure of a candidate's sales performance is unreasonable." (Doc. 50-1, p. 6.) The record indicates that Volkswagen utilizes a Dealer Sales Index ("DSI") to measure its dealerships' sales performances. (See doc. 50-4, pp. 48–50; doc. 50-12, p. 17 (sealed exhibit).) According to Munroe, Volkswagen calculates a Volkswagen dealership's DSI by establishing a geographic territory for each dealership. (See doc. 50-4, p. 47.) Within each territory, Volkswagen examines the number of vehicle registrations for different classifications (or "segments") of vehicles in which Volkswagen competes, such as sedans, SUVs, etc. (See id. at p. 49.) Volkswagen then "take[s] the state average [Volkswagen sales] within those segments[] [and] appl[ies] it for the local average" to generate the DSI standard, which Volkswagen uses as its "minimum expected level." (Id.; see also doc. 50-12, p. 17 (sealed exhibit).) While DSI itself uses a state average "to determine what a particular [Volkswagen] dealer's expected sales are," Munroe testified that Volkswagen also "look[s] at sales performance locally" and regionally. (Doc. 54, pp. 49–50.)

Plaintiffs appear to argue that because Volkswagen uses the DSI standard, which relies on sales averages, Volkswagen's standards for evaluating a prospective transferee's minimally required sales effectiveness are per se unreasonable. (See doc. 50-1, pp. 6–7.) Specifically, Plaintiffs contend that the "[u]se of averages in measuring sales performance is unreasonable because no matter how well dealers are performing . . ., it is a mathematical certainty that some dealers will fall above and some will fall below the average." (Id.) The Court disagrees. First, Plaintiffs failed to cite to any case law holding that a manufacturer's use of averages to evaluate sales effectiveness is per se unreasonable as a matter of law.[13] (See id.; doc. 62, pp. 9–10.)

---

[13] Plaintiffs cite to Beck Chevrolet Co., Inc. v. Gen. Motors LLC, 53 N.E.3d 706 (N.Y. 2016), for support. (Doc. 62, p. 9 n.6.) In Beck Chevrolet Co., the New York Court of Appeals held that using statewide performance standards *alone*, without considering local market data, was unreasonable under New York's

Furthermore, the cases revealed during the Court's independent search indicate that while some courts have found that sales averages may be inherently unreasonable, those cases involved situations in which manufacturers terminated dealerships or refused to consent to transfers *solely* on the basis of sales averages.  See generally, e.g., In re Claremont Acquisition Corp., 186 B.R. 977, 989 (C.D. Cal. 1995) ("Given that numerous dealers will by definition be below average, allowing manufacturers to rely *heavily* on a regional average comparison as the *sole* measure of sales performance would give them too great an opportunity . . . to refuse to consent to the transfer of franchises to qualified candidates.") (emphasis added); see also Marquis v. Chrysler Corp., 577 F.2d 624, 632 (9th Cir. 1978) (failure to meet regional average sales *alone* was not sufficient grounds for termination of a dealer's franchise agreement).  Here, however, it is unclear from the record whether and to what extent Volkswagen uses DSI (and thus, sales averages) as a standard to measure *proposed* dealers' sales effectiveness (as opposed to the sales performance of *existing* Volkswagen dealers).  (See doc. 50-12, p. 17 (sealed exhibit).)  Indeed, under the Transfer Statute, the fact finder must determine the reasonableness of Volkswagen's "standards or qualifications" related to a "*prospective transferee's* business experience, moral character, and financial qualifications."  O.C.G.A. § 10-1-653 (emphasis added).  While the record indicates that DSI is at least one way in which Volkswagen measures sales effectiveness for *existing* Volkswagen dealerships (such as how Volkswagen measured the sales effectiveness of the Volkswagen dealership Step One already owned), Volkswagen does not appear to use DSI as a blanket metric

---

dealership transfer statute.  53 N.E.3d at 712–16 (interpreting New York Vehicle and Traffic Law § 463(2)(gg)).  However, the court in Beck Chevrolet Co. did *not* hold that the use of averages in sales performance was per se unreasonable.  See id.  Instead, the court found that calculating averages for sales performance standards based on statewide data alone was unreasonable.  See id.  Here, Plaintiffs do not argue that DSI is unreasonable due to the sole use of statewide data, (see doc. 50-1, pp. 6–7; doc. 62, pp. 9–10), nor could they as the record indicates that Volkswagen uses local data alongside DSI when evaluating sales performances, (see doc. 50-4, pp. 49–50 (Munroe testifying that Volkswagen uses local and regional data as well as state data)).

to measure the sales performances of *non-Volkswagen* dealerships owned by proposed transferees. (See doc. 50-12, p. 17 (sealed exhibit).)   Thus, a reasonable inference is that if a proposed transferee does not already own a Volkswagen dealership, then Volkswagen's DSI does not play any role in measuring the proposed transferee's sales effectiveness.   (See id.)   Therefore, it appears that Volkswagen does not generally use the sales data derived from its DSI calculation as the sole basis for examining sales effectiveness.   Instead, Volkswagen also relies on other manufacturers' measures of sales effectiveness, and while Volkswagen testified that other manufacturers calculate sales effectiveness "generally the same way," it does not know the "idiosyncrasies" between it and other manufacturers' methods of measuring sales effectiveness.   (Id.)   Moreover, Plaintiffs do not argue or point to any evidence that the other manufacturers' measurements of sales effectiveness are unreasonable.   (See doc. 50-1, pp. 6–7; doc. 62, pp. 9–10.)   Furthermore, to measure the "sales performance standard that a *proposed transferee* must meet in order to meet Volkswagen's business experience qualifications," Volkswagen implements a ████████████ (Doc. 50-12, p. 17 (sealed exhibit) (emphasis added).)   In other words, ████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████ (Id.)   Volkswagen also considers other "explanations" and outside influences for a proposed dealer's poor past sales performance.   (See doc. 50-4, pp. 45–46.)   Thus, though DSI might apply to the evaluation of *proposed* transferees' sales effectiveness if the proposed transferee already owns a Volkswagen dealership (as in this case), the record is clear that DSI is not the sole metric used by Volkswagen. Cf. In re Claremont Acquisition Corp., 186 B.R. at 989 ("Given that numerous dealers will by definition be below average, allowing manufacturers to rely *heavily* on a regional average

comparison as the *sole* measure of sales performance would give them too great an opportunity . . . to refuse to consent to the transfer of franchises to qualified candidates.") (emphasis added). Thus, the Court finds that Plaintiffs are not entitled to summary judgment on this ground.

### D.   Damages

Volkswagen argues that it is entitled to summary judgment because Volkswagen did not cause Plaintiffs any damages.  (Doc. 43-1, pp. 24–25.)  Specifically, Volkswagen argues that Plaintiffs terminated the Savannah APA in August 2018 (thus, rendering the Savannah APA void prior to Volkswagen receiving notice of the Proposed Transfer) and that the parties could not have consummated the Savannah APA by the Closing Date anyway because "numerous conditions precedent remain[ed] unsatisfied."  (Id.)

### (1)   Possible Termination of the Savannah APA

An August 24, 2018, letter from Plaintiffs to Step One (the "Termination Letter") states, "Notice of [Plaintiffs]' termination of the [Savannah APA] is hereby given pursuant to Section 30.6 of the [Savannah APA] for Buyer's failure to deliver the [Escrow] Deposit in accordance with the terms of Section 5.1 of the [Savannah APA]." (Doc. 43-3, p. 234.)  Section 5.1 of the Savannah APA contemplates the payment of the purchase price.  (Id. at p 130.)  Specifically, Section 5.1 provides that Step One "shall deliver" the Escrow Deposit "[w]ithin three (3) business days" of the Savannah APA's effective date (August 21, 2018).  (See id. at pp. 129–30.)  Section 30.6 of the Savannah APA states, "This Agreement may be terminated at any time prior to the Closing . . . by Seller, at any time, if Buyer does not deliver the [Escrow] Deposit in accordance with the terms of Section 5.1." (Id. at pp. 152–53.)

Volkswagen argues that the Termination Letter nullified the Savannah APA because "[t]here is . . . no indication that . . . Plaintiffs and Step One signed a subsequent document to . . .

annul the . . . Termination Letter or reaffirm the Savannah APA." (Doc. 43-1, p. 24.) Because the Savannah APA was null, Volkswagen argues, "there was nothing for [Volkswagen] to review or consent to," and, thus, "[Volkswagen] cannot be liable for any claim based on the Savannah APA." (Id. at pp. 24–25.) Plaintiffs concede that they sent the Termination Letter to Step One. (Doc. 50-1, pp. 21–22.) However, Plaintiffs posit that the Termination Letter did not actually terminate the Savannah APA because the Termination Letter was merely a "nullity." (See id.) According to Plaintiffs, they sent the Termination Letter in anticipation of the fact that the Escrow Deposit (which was due the day the Termination Letter was sent) may not be timely paid by Step One. (Id.) However, Step One paid the Escrow Deposit later that day. Thus, Plaintiffs argue, "Step One complied with the requirements of Section 5.1 of the Savannah APA," "there was no basis under Section 30.6 for termination," "the [Termination Letter] was a nullity," and the Savannah APA was not terminated on August 24, 2018. (Id. at p. 22.)

The Court finds that Volkswagen is not entitled to summary judgment on this ground. First, the Termination Letter does not appear to abide by the Savannah APA's own termination provisions. Indeed, the Termination Letter states that "Notice of [Plaintiffs'] termination of the [Savannah APA] is hereby given pursuant to *Section 30.6* of the [Savannah APA] for [Step One's] *failure to deliver the* [*Escrow*] *Deposit* in accordance with the terms of *Section 5.1* of the [Savannah APA]." (Doc. 43-3, p. 234 (emphasis added).) Under Section 30.6, the Savannah APA could be terminated "by [Plaintiffs], at any time, *if [Step One] does not deliver the* [*Escrow*] *Deposit* in accordance with . . . Section 5.1," (id. at pp. 152–53 (emphasis added)), which required the Escrow Deposit to be delivered "within three (3) business days of the effective date[,] [August 21, 2018]," (id. at pp. 129–30). However, evidence suggests that Step One did in fact deliver the Escrow Deposit in accordance with the terms of Section 5.1. Indeed, Warner Peacock testified

that he did not remember Step One "not providing the deposit," (doc. 43-3, p. 43), and stated in an affidavit that Step One paid the Escrow Deposit and complied with Section 5.1 of the Savannah APA, (doc. 52-1, p. 2).[14]  Furthermore, three days after the deadline for Step One to pay the deposit, Plaintiffs submitted the Savannah APA to Volkswagen for Volkswagen's review.  (Doc. 43-3, p. 44.)  Had Step One *not* complied with Section 5.1 of the Savannah APA, it is unlikely that Plaintiffs would have sent the Savannah APA to Volkswagen at all, especially in light of the Termination Letter.  Thus, because Step One did comply with Section 5.1, Plaintiff's purported termination of the Savannah APA for Step One's failure to "deliver the deposit in accordance with the terms of Section 5.1" was ineffective as Plaintiffs had no basis for terminating the Savannah APA in the first place.  (Doc. 43-3, p. 153.)  In other words, because Step One complied with Section 5.1, any attempt to terminate the Savannah APA for Step One's failure to abide by Section 5.1 would be

---

[14]  Volkswagen argues that the Court should dismiss Warner Peacock's affidavit because it is "directly contradictory" to his deposition testimony that he did not recognize or remember the Termination Letter. (Doc. 60, p. 32.)  The Court "may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is *directly contradicted* by deposition testimony." McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (emphasis added); see Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  However, Warner Peacock's deposition testimony that he did not remember or recognize the Termination Letter does not "directly contradict" his affidavit statements that Volkswagen received the Escrow Deposit and that Step One complied with Section 5.1 of the Savannah APA.  (Compare doc. 43-3, p. 43, with doc. 52-1, p. 2); compare Deneau v. Orkin, LLC, No. 11-00455-B, 2013 WL 2178045, at *6 (S.D. Ala. May 20, 2013) ("Black's affidavit testimony does not 'flatly contradict' his previous deposition testimony that he did not know why *Plaintiff* may not have been considered for the position.  Because Black's affidavit in this instance does not directly or flatly contradict his earlier deposition testimony, it does not constitute a sham.  Thus, Plaintiff's argument for disregarding the affidavit testimony is without merit.") (citations omitted), with Bryant v. U.S. Steel Corp., 428 F. App'x 895, 897 (11th Cir. 2011) ("Bryant's affidavit, in which she stated that she remembered the exact date on which she received the right-to-sue letter, *flatly contradicted* her earlier deposition testimony, in which she stated that she did not remember the date.  The affidavit, filed after her deposition had been taken and discovery had closed, supplied a specific fact that Bryant denied knowledge of when questioned on deposition.").  Indeed, Warner Peacock could remember that Step One paid the Escrow Deposit while simultaneously forgetting about the Termination Letter.  Accordingly, the Court declines Volkswagen's request to disregard Warner Peacock's affidavit.

improper.  See generally Caradigm USA LLC v. PruittHealth, Inc., 253 F. Supp. 3d 1175, 1190–91 (N.D. Ga. 2017) (finding that a party's failure to provide notice of termination in accordance with a contract's termination provision constituted improper termination).  Therefore, because the Savannah APA was not terminated by the Termination Letter, Volkswagen could still be liable for damages that occurred due to its purported improper refusal to consent to the Proposed Transfer.

### (2)   Conditions Precedent to the Consummation of the Savannah APA

Volkswagen next argues that it cannot be liable for any damages because "[t]he Savannah APA could not have been consummated by the Closing date regardless of [Volkswagen's] action due to numerous conditions precedent remaining unsatisfied."  (Doc. 43-1, p. 25.)  Specifically, Volkswagen contends that "Step One did not have manufacturer approval from the manufacturers implicated in the Brunswick APA, Step One had not been awarded an Alfa Fiat franchise in Savannah, GA, and the FCA Lawsuit had not been dismissed."  (Id.)  Thus, according to Volkswagen, "[b]ecause these events and conditions operated independently from [Volkswagen's] actions, any damage experienced by . . . Plaintiffs cannot plausibly be caused by [Volkswagen] [because] [t]he Savannah APA simply would not have closed on October 31, 2018."  (Id.)

However, a question of fact exists as to whether these conditions were or would have been satisfied prior to the Closing Date.  Regarding the manufacturer approvals, Step One testified that it had approval from all manufacturers except for Volkswagen before the Closing Date.  (Doc. 50-7, p. 37.)  Furthermore, Step One testified that the Savannah APA was the only factor preventing the Brunswick APA from closing.  (Id.)  Concerning the FCA Lawsuit, Warner Peacock stated in his affidavit that Plaintiffs were prepared to dismiss the FCA Lawsuit simultaneously with the closing of the Proposed Transfer.  (See doc. 52-1, p. 3.)  Finally, concerning the Alfa Fiat dealership, Volkswagen has not pointed to any evidence that Step One was not going to be awarded

an Alfa Fiat dealership by the Closing Date.[15]   (See doc. 43-1, p. 25; doc. 43-2, pp. 24–25, doc. 59, pp. 29–30.)   Thus, a question of material fact exists as to whether Volkswagen's failure to consent to the Proposed Transfer caused damages to Plaintiffs.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Defendant Volkswagen's Motion for Summary Judgment, (doc. 43), and **DENIES** Plaintiffs' Motion for Partial Summary Judgment, (doc. 50). The Court **DIRECTS** the Clerk of Court to file the redacted version of this Order on the docket for public access and file separately the unredacted version of this Order as a restricted document, so that only the Court and the parties may have access to the unredacted version.

**SO ORDERED**, this 22nd day of March, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[15]   The record is unclear as to whether Step One was purchasing an Alfa Fiat dealership at all.   While the Savannah APA indicates that Step One's acquisition of an Alfa Fiat dealership in Savannah was a waivable condition to the closing of the Savannah APA, (doc. 43-3, p. 145), an October 12, 2018, letter Step One sent to Volkswagen states that Step One is "only purchasing a Volkswagen dealership," (id. at p. 172).